UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

WAYNE COUNTY EMPLOYEES'
RETIREMENT SYSTEM, Derivatively on
Behalf of COMSCORE, INC.,

                Plaintiff,

    vs.

GIAN M. FULGONI, WILLIAM P. LIVEK,
SERGE MATTA, MAGID M. ABRAHAM,
DAVID I. CHEMEROW, MELVIN F.
WESLEY III, KENNETH J. TARPEY,
WILLIAM J. HENDERSON, WILLIAM E.
ENGEL, RUSSELL FRADIN, RONALD J.
KORN, BRENT D. ROSENTHAL, JEFFREY
GANEK, WILLIAM KATZ, JOAN M. LEWIS
and PATRICIA A. GOTTESMAN,

                Defendants.

    -and-

COMSCORE, INC., a Delaware corporation,

            Nominal Defendant.

———————————————————— x

Civil Action No.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS AND
STATE LAW CLAIMS FOR BREACHES OF
FIDUCIARY DUTIES, ABUSE OF
CONTROL, CONSTRUCTIVE FRAUD,
CORPORATE WASTE, UNJUST
ENRICHMENT AND GROSS
MISMANAGEMENT

DEMAND FOR JURY TRIAL

## INTRODUCTION AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of comScore, Inc. ("comScore" or the "Company") on behalf of the Company against the members of its current Board of Directors (the "Board") and certain of its current and/or former senior directors and executives (collectively, "Defendants").  This action seeks to remedy Defendants' violations of federal and state law, including breaches of fiduciary duties, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement, arising out of a scheme and wrongful course of business whereby Defendants, dating back to 2013, had caused comScore to repeatedly overstate its publicly-reported financial results in violation of Generally Accepted Accounting Principles ("GAAP"), to operate without effective internal controls to facilitate the false financial reporting, to file false and misleading statements with the Securities and Exchange Commission ("SEC") and to permit certain of its current and former executives to profit from this misconduct.

2.      Nominal Party comScore is a global media measurement and analytics company providing marketing data and analytics to many of the world's largest enterprises, media and advertising agencies, and publishers.  The Company's technology offerings promise to more accurately measure e-commerce audience size, allowing the purchasers of advertising to effectively allocate spending budgets and media content sites to profitably market their advertising landscape.

3.      During 2013, Defendants began causing the Company to improperly book more than $43 million in revenue from so-called nonmonetary "barter" transactions, permitting comScore's management to manipulate the Company's reported earnings and to conceal how and the extent to which its use of nonmonetary transactions overstated the Company's reported revenues and earnings. Defendants' recognition of nonmonetary revenue also caused comScore to dramatically overstate its billings and revenue growth, important metrics for investors, causing a dramatic increase in the market price of comScore common stock as set forth in the following chart:



4.      In these nonmonetary "barter" transactions, comScore was providing its subscription products and solutions that it typically sold on a cash basis to data source providers in exchange for additional consumer demographics and segmentation data from those data source providers that Defendants later claimed "improve[d] the accuracy and granularity of [the Company's] products and services."[1]  The lion's share of those nonmonetary transactions were conducted with a single counterparty, the Acxiom Corporation ("Acxiom"), upon whose board of directors the current Chairman of the comScore Board, William J. Henderson ("Henderson"), also sits.  Because the counterparties to these nonmonetary transactions were not exchanging actual cash payments, both sides could unilaterally decide the value of the services provisioned and the related expenses to them of provisioning services, proving substantial opportunity to manipulate revenue recognition.

---

[1]      Unless otherwise noted, internal citations are omitted and emphasis is added throughout.

5.     In February 2016, the comScore Board's Audit Committee announced that it was commencing an investigation into the Company's accounting after having received tips concerning possible accounting malfeasance.  In August 2016, the Company announced that it would need additional time to file its interim financial statements for the second quarter of 2016.  Defendants revealed that the Board had identified some misreporting of nonmonetary revenue – primarily barter transactions.  comScore also disclosed that it had appointed its co-founder Gian M. Fulgoni ("Fulgoni") to replace its then-Chief Executive Officer ("CEO") Serge Matta ("Matta") as CEO.  Then Executive Vice Chairman of the Board, William Livek ("Livek"), who had only recently joined comScore in connection comScore's acquisition of the Rentrak Corporation ("Rentrak") in February 2016, would assume responsibilities for the Company's strategic and day-to-day operations.  comScore also abruptly fired its Chief Financial Officer ("CFO") Melvin F. Wesley III ("Wesley").

6.     On September 15, 2016, Defendants announced that the Board's Audit Committee had concluded that ***all*** of comScore's previously-issued financial statements for fiscal years 2013 and 2014, along with the first three interim reporting periods of fiscal 2015 and the Company's fiscal year 2015 financial results that had been reported on February 23, 2016, could no longer be relied upon and would have to be restated because they erroneously recognized revenue from nonmonetary transactions that should never have been recognized in violation of GAAP.  As a result, the Company then reported that ***all*** of the ***more than $43 million*** in nonmonetary revenue Defendants had caused comScore to report in its financial statements had been recognized in violation of GAAP.  Of that more than $43 million in nonmonetary revenue that the Company has now admitted was improperly recognized, more than $19 million—***nearly half***—was derived from transactions with Acxiom.

7.      In the ensuing weeks, Defendants would claim that comScore's outgoing CEO and CFO had merely "resigned from employment with the Company for Good Reason" in connection with the "change of control" that occurred in connection with the Rentrak acquisition in early 2016, rather than for-cause terminations.   Because the Board deemed those terminations "for Good Reason," comScore had to pay each of those faithless fiduciaries hundreds of thousands of dollars in severance payments, including receiving multi-hundred thousand dollar annual salaries for 24 months in the case of Defendant Matta and for 15 months in the case of Defendant Wesley.  They were also allowed to keep $9 million of stock and restricted stock units ("RSUs") that had improperly vested to them as a direct result of the artificial stock price inflation their false financial reporting had caused.

8.      On November 17, 2016, the newly appointed Chairman of comScore's Board and yet another independent outside director both suddenly and without explanation resigned from their positions.

9.      Then on November 23, 2016, comScore was forced to disclose that it had identified more improper accounting concerning monetary transactions and contracts in additional amounts the Company has not yet quantified.  Whereas Defendants had represented in August 2016 that the elimination of improper recognition of revenues on barter transactions would be at least partially offset by the corresponding elimination of related expenses, there would be no offsetting elimination of expenses for the newly discovered improper revenue recognition on these monetary contracts.

10.     Concerning the defects in comScore's internal controls that had facilitated the false financial reporting, Defendants disclosed on November 23, 2016 that the "Audit Committee's investigation also identified concerns regarding internal control deficiencies, ***including concerns about tone at the top***; errors in judgment identified with respect to issues reviewed; information not

having been provided to the Company's accounting group and its external auditors; and the sufficiency of public disclosures made by the Company about certain performance metrics." As of the filing of this Complaint, comScore has still been unable to fully quantify the required financial restatements or to bring its SEC filings current and the NASDAQ is threatening to permanently delist the Company's common stock if those filings are not brought current by February 23, 2017.

11.     Defendants' malfeasance, mismanagement and self-dealing during the relevant period has wreaked or threatened to wreak hundreds of millions of dollars of damages on comScore. The Company's senior executives were incentivized to issue false and misleading financial reports and statements in order to run up the market price of comScore common stock and then sell their personally-held comScore shares to the unsuspecting public. Indeed, while in possession of material non-public information, certain of the Defendants abused their fiduciary relationship with the Company by selling more than $78.3 million of their personally held shares to the unsuspecting public at artificially inflated prices. In a further effort to buttress the market price of the common stock to facilitate those stock sales, Defendants also caused comScore to engage in a share buy-back and repurchase more than four million of comScore shares at artificially inflated prices, thereby causing comScore to overpay an estimated $49 million for those shares. As a result of Defendants' misconduct, the Company has been sued in this Court by purchasers of its common stock and that lawsuit seeks hundreds of millions of dollars in damages on a classwide basis for violations of the federal securities laws. comScore has also been named as a defendant in various other lawsuits arising from this same misconduct.

12.     Defendants' gross mismanagement, malfeasance, misrepresentations, self-dealing and wrongful course of conduct violated the Securities Exchange Act of 1934 (the "Exchange Act"), as well as New York and Delaware law, exposing comScore to criminal and civil liability. By

authorizing and/or acquiescing in the accounting misstatements, Defendants: (i) caused comScore to issue materially false and misleading financial reports and to file materially false and misleading financial statements with the SEC; (ii) caused comScore common stock to trade at artificially inflated prices, facilitating the sale of more than $78.3 million of certain comScore's senior executives' and directors' personally-held comScore common stock at artificially inflated prices; (iii) caused comScore to waste more than $49 million repurchasing its own shares at those same artificially inflated prices; (iv) exposed comScore to hundreds of millions of dollars in potential liability to its investors and regulators, including the SEC; and (v) caused comScore to improperly pay hundreds of thousands of dollars in severance payments to departing executives and allowed them to walk away with millions of dollars of improperly vested stocks and RSUs, instead of requiring them to reimburse the Company for the potentially hundreds of millions of dollars in damages they caused.

13.    This action seeks recovery for comScore against these faithless fiduciaries, as comScore's Board of Directors, as currently composed, is simply unable or unwilling to do so.

## JURISDICTION AND VENUE

14.    The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§78j(b) and 78t(a)), and SEC Rule 10b-5 (17 C.F.R. §240.10b-5), promulgated thereunder, and under state law for breaches of fiduciary duties, abuse of control, constructive fraud, corporate waste, unjust enrichment and gross mismanagement.  In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail and the facilities of a national securities market.

15.     This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act (15 U.S.C. §78aa), as well as 28 U.S.C. §1331.  This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.

16.     This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

17.     Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa), as well as 28 U.S.C. §1391(b).  Many of the acts alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  comScore and certain of the Defendants also conduct business in this District.  The Company maintains significant operations in New York City, the U.S. advertising mecca, at both its 7 Penn Plaza and its 352 Park Avenue South locations.  The Company's common stock is listed and trades on the NASDAQ located in this District and Defendants conducted various investor conferences in New York City during the relevant period to communicate with comScore investors.

## PARTIES

18.     Plaintiff Wayne County Employees' Retirement System is a shareholder of comScore, and holds and has held comScore stock at relevant times.

19.     Nominal party comScore is a Delaware corporation founded in 1999.

20.     Defendant Fulgoni co-founded comScore in 1999, has served on its Board since founding and has served as its CEO since September 2016.  Previously, Defendant Fulgoni served as Executive Chairman of the Board from comScore's founding in 1999 until March 2014 and as Chairman Emeritus from March 2014 until August 2016.  comScore's 2015 Annual Proxy statement to shareholders concedes that even when merely serving as Chairman Emeritus, Defendant Fulgoni lacked independence from the other Board members due to his positions at the Company and relationships with its management.  Defendant Fulgoni also serves as a director of Dynamic Signal,

Inc. ("Dynamic Signal"), a social media marketing technology company for which Defendant Fradin (defined below) serves as chairman of the board of directors and CEO. Defendant Fulgoni also sits on the Petmed Express, Inc. ("Petmeds") board of directors with Defendant Korn (defined below), where they both sit on the audit, compensation and corporate governance committees together and Defendant Korn is chairman of the audit committee. Because of Defendant Fulgoni's positions, he knew the adverse non-public information about the business of comScore, as well as its finances, markets and present and future business prospects, *via* access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and *via* reports and other information provided to him in connection therewith. During the relevant period, Defendant Fulgoni participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings. While in the possession of material non-public information about comScore, Defendant Fulgoni sold $6.2 million of his personally-held comScore stock during the relevant period at fraud-inflated prices.

21. Defendant Livek has served as a member of the comScore Board since comScore acquired Rentrak in February 2016 and has served as the Executive Vice Chairman and President of comScore since August 2016. Previously, Defendant Livek served as a director of Rentrak and as Rentrak's CEO prior to comScore's acquisition by Rentrak. At comScore, Defendant Livek receives an annual salary of at least $435,000 per year plus annual cash bonuses and long term incentive awards consistent with the senior executives of comScore. Because of Defendant Livek's positions, he knew the adverse non-public information about the business of comScore, as well as its finances, markets and present and future business prospects, *via* access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at

management and/or Board meetings and committees thereof and *via* reports and other information provided to him in connection therewith. During the relevant period, Defendant Livek participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings.

22.     Defendant Matta served as comScore's CEO from March 1, 2014 until August 5, 2016, after joining the Company in 2000. Defendant Matta formally ended his employment with comScore on October 10, 2016 and resigned his directorship on December 15, 2016. Because of Defendant Matta's positions, he knew the adverse non-public information about the business of comScore, as well as its finances, markets and present and future business prospects, *via* access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and *via* reports and other information provided to him in connection therewith. During the relevant period, Defendant Matta participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings. While in the possession of material non-public information about comScore, Defendant Matta sold $10.6 million of his comScore stock during the relevant period at fraud-inflated prices.

23.     Defendant Magid M. Abraham ("Abraham") co-founded comScore in 1999 and was, from the Company's inception until March 1, 2014, comScore's CEO, and, from March 1, 2014 until July 21, 2016, the Executive Chairman of the comScore Board. On December 5, 2016, the Company announced that Defendant Abraham had resigned his board seat effective immediately. Because of Defendant Abraham's positions, he knew the adverse non-public information about the business of comScore, as well as its finances, markets and present and future business prospects, *via* access to internal corporate documents, conversations and connections with other corporate officers and

employees, attendance at management and/or Board meetings and committees thereof and *via* reports and other information provided to him in connection therewith.  During the relevant period, Defendant Abraham participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings.  While in the possession of material non-public information about comScore, Defendant Abraham sold $29.9 million of his comScore stock during the relevant period at fraud-inflated prices.

24.     Defendant David I. Chemerow ("Chemerow") has served as comScore's CFO since August 5, 2016.  Previously, he served as Rentrak's Chief Operating Officer, CFO, and Secretary until comScore's acquisition of Rentrak.  Because of Defendant Chemerow's positions, he knew the adverse non-public information about the business of comScore, as well as its finances, markets and present and future business prospects, *via* access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and *via* reports and other information provided to him in connection therewith.  During the relevant period, Defendant Chemerow participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings.

25.     Defendant Wesley was, from August 29, 2014 until August 5, 2016, comScore's CFO.  Defendant Wesley did not formally end his employment with comScore until October 10, 2016. Because of Defendant Wesley's positions, he knew the adverse non-public information about the business of comScore, as well as its finances, markets and present and future business prospects, *via* access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and *via* reports and other information provided to him in connection therewith.  During the relevant

period, Defendant Wesley participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings. While in the possession of material non-public information about comScore, Defendant Wesley sold $6.2 million of his comScore stock during the relevant period at fraud-inflated prices.

26.     Defendant Kenneth J. Tarpey ("Tarpey") was, from April 20, 2009 until August 5, 2014, comScore's CFO. Because of Defendant Tarpey's positions, he knew the adverse non-public information about the business of comScore, as well as its finances, markets and present and future business prospects, *via* access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and *via* reports and other information provided to him in connection therewith. During the relevant period, Defendant Tarpey participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings. While in the possession of material non-public information about comScore, Defendant Tarpey sold $1 million of his comScore stock during the relevant period at fraud-inflated prices.

27.     Defendant William J. Henderson ("Henderson"), who served as a member of the comScore Board, Chair of its Compensation Committee and its Lead Independent Director throughout the relevant period, was recently named the Chairman of the Board on November 18, 2016. Defendant Henderson has also concurrently served on the board of directors of Acxiom since June 2001, where he serves as chairman of that board's compensation committee and as a member of its corporate governance committee. Because of Defendant Henderson's positions, he knew the adverse non-public information about the business of comScore, as well as its finances, markets and present and future business prospects, *via* access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and

committees thereof and *via* reports and other information provided to him in connection therewith. During the relevant period, Defendant Henderson participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings. As a member of the Compensation Committee (Chairman) at all relevant times, Defendant Henderson controlled the other Defendants' executive compensation. As a member of the Audit Committee at all relevant times, Defendant Henderson caused or allowed the dissemination of the improper public statements described herein. While in the possession of material non-public information about comScore, Defendant Henderson sold $1.4 million of his comScore common stock during the relevant period at fraud-inflated prices.

28.     Defendant William E. Engel ("Engel") has served as a director of comScore since February 2016 and joined the Board when comScore acquired Rentrak where Defendant Engel had served as a director. Because of Engel's position, he knew the adverse non-public information about the business of comScore, as well as its finances, markets and present and future business prospects, *via* access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and *via* reports and other information provided to him in connection therewith. During the relevant period, Defendant Engel participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings.

29.     Defendant Russell Fradin ("Fradin") has served as a director of comScore since July 2014. Previously, Defendant Fradin served as comScore's Executive Vice President, Corporate Development from June 2000 to June 2004. In addition to serving as a director of comScore during the relevant period, Defendant Fradin serves as the chairman of the board and the CEO at Dynamic Signal, where Defendant Fulgoni serves on his board. Because of Defendant Fradin's positions, he

knew the adverse non-public information about the business of comScore, as well as its finances, markets and present and future business prospects, *via* access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and *via* reports and other information provided to him in connection therewith.  During the relevant period, Defendant Fradin participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings.  As a member of the comScore Compensation Committee during 2014-2016, Defendant Fradin controlled the executive compensation of the other Defendants.

30.     Defendant Ronald J. Korn ("Korn") has served as a director of comScore at all relevant times.  Defendant Korn also sits on the Petmeds Board of Directors with Defendant Fulgoni, where both sit on the audit, compensation and corporate governance committees together and Defendant Korn is chairman of the audit committee.  Because of Korn's position, he knew the adverse non-public information about the business of comScore, as well as its finances, markets and present and future business prospects, *via* access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and *via* reports and other information provided to him in connection therewith. During the relevant period, Defendant Korn participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings.  As a member of the Audit Committee in 2013, 2015 and as Chair in 2016, Defendant Korn caused or allowed the dissemination of the improper public statements described herein.  While in the possession of material non-public information about comScore, Defendant Korn sold $205,800 of his comScore stock during the relevant period at fraud-inflated prices.

31.     Defendant Brent D. Rosenthal ("Rosenthal") has served as a director of comScore since February 2016 when comScore acquired Rentrak where Defendant Rosenthal had served as a director.  Because of Defendant Rosenthal's positions, he knew the adverse non-public information about the business of comScore, as well as its finances, markets and present and future business prospects, *via* access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and *via* reports and other information provided to him in connection therewith.  During the relevant period, Defendant Rosenthal participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings.  As a member of the Audit Committee during 2016, Defendant Rosenthal caused or allowed the dissemination of the improper public statements described herein.

32.     Defendant Jeffrey Ganek ("Ganek") served as a director of comScore between 2008 and 2014.  Because of Defendant Ganek's position, he knew the adverse non-public information about the business of comScore, as well as its finances, markets and present and future business prospects, *via* access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and *via* reports and other information provided to him in connection therewith.  During the relevant period, Defendant Ganek participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings.  As a member of the Audit Committee during 2013-2014, Defendant Ganek caused or allowed the dissemination of the improper public statements described herein.

33.     Defendant William Katz ("Katz") served as a director of comScore at all relevant times until he resigned his directorship in September 2016.  Because of Defendant Katz's position,

he knew the adverse non-public information about the business of comScore, as well as its finances, markets and present and future business prospects, *via* access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and *via* reports and other information provided to him in connection therewith.  During the relevant period, Defendant Katz participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings.  As a member of the comScore Compensation Committee at all relevant times, Defendant Katz controlled the executive compensation of the other Defendants.

34.     Defendant Joan M. Lewis ("Lewis") served as a director of comScore between January 2015 and when she resigned her directorship in November 2016.  Defendant Lewis also served as the Chairman of the Board between July 2016 and November 2016.  Because of Defendant Lewis's positions, she knew the adverse non-public information about the business of comScore, as well as its finances, markets and present and future business prospects, *via* access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and *via* reports and other information provided to her in connection therewith.  During the relevant period, Defendant Lewis participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings.  As a member of the Audit Committee during 2015-2016, Defendant Lewis caused or allowed the dissemination of the improper public statements described herein.

35.     Defendant Patricia A. Gottesman ("Gottesman") served as a director of comScore between February 2016 when comScore acquired Rentrak and when she resigned her directorship in November 2016.  Previously Defendant Gottesman had served as a director of Rentrak.  Because of Defendant Gottesman's positions, she knew the adverse non-public information about the business

of comScore, as well as its finances, markets and present and future business prospects, *via* access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and *via* reports and other information provided to her in connection therewith.   During the relevant period, Defendant Gottesman participated in the issuance and preparation of materially false and/or misleading statements, including press releases and SEC filings.

36.     The defendants identified in ¶¶ 20-21 and 27-31 comprise the current Board as of the filing of this Complaint and are sometimes referred to herein as the "Director Defendants."  The defendants identified in ¶¶20-26 are sometimes referred to herein as the "Officer Defendants."  The defendants identified in ¶¶20, 22, 23, 25-27 and 30 are sometimes referred to herein as the "Insider Selling Defendants."

## DEFENDANTS' DUTIES

37.     Each officer and director of comScore named herein owed the Company and comScore shareholders the duty to exercise a high degree of care, loyalty and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of comScore's directors and officers complained of herein involves knowing, intentional and culpable violations of their obligations as officers and directors of comScore.   Further, the misconduct of comScore's officers has been ratified by comScore's Board, which has failed to take any legal action on behalf of the Company against them.

38.     By reason of their positions as officers, directors and fiduciaries of comScore and because of their ability to control the business and corporate affairs of the Company, Defendants owed comScore and its shareholders fiduciary obligations of candor, trust, loyalty and care, and were required to use their ability to control and manage comScore in a fair, just, honest and equitable manner, and to act in furtherance of the best interests of comScore and its shareholders so as to

benefit all shareholders equally and not in furtherance of their personal interest or benefit.  In addition, as officers and/or directors of a publicly held company, the Defendants had a duty to refrain from utilizing their control over comScore to divert assets to themselves *via* improper and/or unlawful practices.  Defendants also had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, earnings and compensation practices.

39.    Because of their positions of control and authority as directors or officers of comScore, each of the Defendants was able to and did, directly and indirectly, control the wrongful acts complained of herein.  As to the Director Defendants, these acts include: (i) agreement to and/or acquiescence in Defendants' false financial reporting; (ii) permitting comScore to operate with defective internal controls; and (iii) allowing certain Defendants to unjustly enrich themselves to the detriment of the Company.  Because of their positions with comScore, each of the Defendants was aware of these wrongful acts, had access to adverse non-public information and was required to disclose these facts promptly and accurately to comScore shareholders and the financial markets but failed to do so.

40.    To discharge their duties, the directors of comScore were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the business and financial affairs of comScore.  By virtue of such duties, the officers and directors of comScore were required, among other things, to:

(a)    manage, conduct, supervise and direct the business affairs of comScore in accordance with all applicable law (including federal and state laws, government rules and regulations and the charter and bylaws of comScore);

(b)    neither engage in self-dealing nor knowingly permit any officer, director or employee of comScore to engage in self-dealing;

(c)     neither violate nor knowingly permit any officer, director or employee of comScore to violate applicable laws, rules and regulations;

(d)     remain informed as to the status of comScore's operations, including its accounting practices, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with the U.S. federal securities laws and their duty of candor to the Company's shareholders;

(e)     prudently protect the Company's assets, including taking all necessary steps to recover corporate assets (cash, stock options and RSUs) improperly paid to Company executives and directors together with the related costs (professional fees) proximately caused by the illegal conduct described herein;

(f)     establish and maintain systematic and accurate records and reports of the business and affairs of comScore and procedures for the reporting of the business and affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(g)     maintain and implement an adequate, functioning system of internal legal, financial and accounting controls, such that comScore's financial statements – including its expenses, accounting and other financial information – would be accurate and the actions of its directors would be in accordance with all applicable laws;

(h)     exercise control and supervision over the public statements to the securities markets and trading in comScore stock by the officers and employees of comScore; and

(i)     supervise the preparation and filing of any financial reports or other information required by law from comScore and to examine and evaluate any reports of

examinations, audits or other financial information concerning the financial affairs of comScore and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

41.     Each Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of comScore, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders which Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Defendants who were also officers and/or directors of the Company during the relevant period has been ratified by the Director Defendants who comprised comScore's entire Board during the relevant period.

42.     Defendants breached their duties of loyalty and good faith by allowing or by themselves causing the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Defendants from taking such illegal actions.  As a result, comScore has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

     (a)     improvidently paid executive compensation;

     (b)     increased capital costs as a result of the loss of market capitalization and the Company's damaged reputation in the investment community;

     (c)     costs incurred to carry out internal investigations, including legal fees paid to outside counsel; and

(d)      incurring possible civil lawsuit damages and/or SEC fines or penalties for improperly reporting revenue.

43.      These actions have irreparably damaged comScore's corporate image and goodwill. For at least the foreseeable future, comScore will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that comScore's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## AIDING AND ABETTING AND CONCERTED ACTION

44.      In committing the wrongful acts alleged herein, Defendants have pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of their common plan.

45.      During all times relevant hereto, Defendants collectively and  individually initiated a course of conduct which was designed to and did: (i) conceal the fact that the Company was allowing its directors and senior officers to force comScore to misrepresent its financial results in violation of GAAP; (ii) artificially inflate the market price of comScore common stock by causing comScore to report those false financial results; (iii) otherwise buttress the market price of comScore common stock by causing comScore to repurchase more than $49 million of its own shares on the open-market at artificially inflated prices; (iv) facilitate insider selling of more than $78.3 million of common stock by certain Defendants; (v) expose the Company to hundreds of millions of dollars in potential civil and criminal liability to investors and regulators; (vi) maintain certain of the Defendants' executive and directorial positions at comScore and the profits, power and prestige which Defendants enjoyed as a result of these positions; (vii) allow other Defendants to resign their positions with the Company to receive hundreds of thousands of dollars in improper severance payments instead of reimbursing the Company for the damages their misconduct caused; and (viii) to

deceive the investing public, including shareholders of comScore, regarding comScore's financial performance.

46.     The purpose and effect of Defendants' common course of conduct was, among other things, to disguise Defendants' violations of law, breaches of fiduciary duties, abuse of control, gross mismanagement, corporate waste and unjust enrichment, to conceal adverse information concerning the Company's operational and financial condition and to artificially inflate the price of comScore common stock so they could dispose of millions of dollars of their own comScore stock, and enhance their executive and directorial positions and receive the substantial compensation they obtained as a result thereof.

47.     Defendants accomplished their common enterprise and/or common course of conduct by causing the Company to purposefully and/or recklessly misrepresent comScore's financial results; to artificially inflate the stock price to facilitate tens of millions of dollars of insider stock sales; to further buttress the stock price to facilitate those insider sales by causing comScore to repurchase tens of millions of dollars of its own common stock on the open market at inflated prices; and promising to pay certain outgoing executives hundreds of millions of dollars in severance payments rather than requiring them to reimburse comScore for the potentially hundreds of millions of dollars in damages they caused it.   Each of the Defendants was a direct, necessary, and substantial participant in the common enterprise and/or common course of conduct complained of herein.

48.     Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

49.     Nominal Defendant comScore was founded in July 1999 by Defendants Fulgoni and Abraham as a large online panel (group of users) to track online commerce.  Traditional methods for companies to track online behavior failed to effectively track e-commerce because of the lower incidence of completing sales online.  With normal panels in tracking visitation being around only twenty to thirty thousand and, with less than 2-3% of the population then making online purchases, Defendants Fulgoni and Abraham determined their panel size needed to be at least one to two million.  They decided to build that very large panel using more aggressive recruiting methodology and managing for the error by using advanced statistical methods and controls.

50.     comScore now maintains a massive panel of users who have monitoring software (with brands including PermissionResearch, OpinionSquare and VoiceFive Networks) installed on their computers.  In exchange for joining the comScore research panels, users are presented with various benefits, including computer security software, Internet data storage, virus scanning and chances to win cash or prizes.  comScore estimates that two million users are now part of its monitoring program.  comScore's data is used to generate reports on topics ranging from web traffic to video streaming activity and consumer buying power.  Following its founding, comScore grew through acquisitions, acquiring several large customer bases helping to accelerate the growth of comScore's syndicated measurement service.

51.     In 2007, the Company went public through an initial public stock offering ("IPO") and listed its shares on the NASDAQ.

52.     On February 11, 2014, comScore announced the appointment of Defendant Matta as its CEO and on August 5, 2014 it announced the appointment of Defendant Wesley as its CFO.

53.     In September 2015, comScore and Rentrak announced that comScore would acquire Rentrak (the "Rentrak Acquisition").  Defendants billed the Rentrak Acquisition as beneficial as it

would combine comScore's digital media measurement capabilities with the TV measurement

capabilities of Rentrak to create an even more massive cross-platform media measurement firm,

perhaps even capable of challenging Nielsen Holdings PLC in the media measurement space.  Under

the terms of the acquisition agreement, comScore would acquire Rentrak in an all-stock deal valued

at approximately $732 million, with Rentrak shareholders receiving 1.15 shares of comScore for

each share of Rentrak.  On February 1, 2016, comScore completed the Rentrak Acquisition.

54.     According to a complaint filed in a case pending in the Circuit Court of the State of

Oregon, captioned *In re Rentrak Corp. Shareholders Litigation*, 15-cv-27429, Rentrak retained

Grant Thornton LLP ("Grant Thornton") to perform financial due diligence on comScore in

connection with conducting its due diligence in connection with the Rentrak acquisition.  According

to the complaint in that case, Grant Thornton provided the Rentrak board of directors, which then

included Defendants Livek, Engel and Rosenthal, with a report dated September 4, 2015 raising

several red flags regarding comScore's recognition of nonmonetary revenue, including the following

key findings:

- comScore's use of nonmonetary, *i.e.*, "barter," transactions for the sharing of data or exchange of services that comScore had accounted for as revenue "may have provided opportunities for [comScore] Management to 'manage' revenues to meet targets."

- comScore's use of nonmonetary transactions "may not be fully understood by research analysts and [investors].  It [was] unclear how much [comScore's] stock price may be impacted if [comScore's] non-monetary arrangements are better understood."

- "It is unclear how much analysts have incorporated [nonmonetary transactions] in their forecasts and understand the arrangement's impact on revenue and earnings."

- A "[c]onsensus revenue for virtually all periods would not have been achievable without [nonmonetary transactions]."

55.     Nonetheless, on September 29, 2015, comScore and Rentrak announced that they had

entered into a final merger agreement.  The September 29, 2015 press release announcing the

- 23 -

Rentrak Acquisition stated that Defendants Abraham, Matta and Wesley were staying on as comScore's Chairman, CEO and CFO respectively, with Rentrak's senior executives assuming supporting executive roles. The press release stated in pertinent part as follows:

> **Combined Company Management Team and Governance**
>
> comScore's current Chief Executive Officer, Serge Matta, will lead the combined company as CEO. Dr. Magid Abraham will remain as the Executive Chairman of the Board. Bill Livek, Rentrak's current Vice Chairman & CEO, will serve as the company's Executive Vice Chairman & President. Mel Wesley will continue as the Chief Financial Officer, and David Chemerow, Rentrak's current COO & CFO, will serve as a strategic advisor to the CEO, focused on the successful integration of the two companies. The new company will also draw upon the collective talent at both companies to harness the experience and expertise of each organization to redefine the future of measurement. The combined company's board will consist of twelve directors – eight from comScore and four from Rentrak.

## DEFENDANTS INFLATE THE MARKET PRICE OF COMSCORE COMMON STOCK BY FALSIFYING COMSCORE'S FINANCIAL REPORTS

56. During the relevant period,[2] Defendants caused comScore common stock to trade at artificially inflated levels by issuing a series of materially false and misleading statements regarding the Company's financial results, business and prospects. Specifically, Defendants caused or allowed comScore to issue materially false and misleading financial statements that failed to disclose or misstated the following: (i) that Defendants were causing comScore to improperly recognize revenues on millions of dollars of nonmonetary barter transactions and other monetary contracts in violation of GAAP; and (ii) that the Company's internal reporting controls were defective and preventing it from issuing accurate financial reports and projections.

57. The quarter-after-quarter reports of "record" revenue growth that Defendants caused comScore to issue during the relevant period included not only cash revenue from customers buying its services and products, but also tens of millions of dollars in revenue the Company recognized

---

[2] The relevant period commenced in 2013 and runs through the present as the Company has not yet disclosed the full extent of its false financial reporting.

from nonmonetary transactions.  These nonmonetary transactions, which are also sometimes referred to as "barter transactions," involved data-sharing agreements with other parties.  Under these arrangements, comScore and its counterparties would swap data without exchanging any significant cash or other payment.  comScore's counterparties booked no revenue from these data swaps. Nonetheless, comScore booked tens of millions of dollars in revenue from these nonmonetary transactions based on Defendants' unilateral determination of the "fair value" of the data exchanged.

58.     While Defendants did not break out comScore's nonmonetary revenue in its press releases or during its quarterly conference calls held with investors and stock analysts during the relevant period, certain of comScore's filings with the SEC did disclose the amount of revenue attributable to nonmonetary transactions for certain periods as follows:

| REPORTING PERIOD ENDED | "RECORD" REVENUE REPORTED | NONMONETARY REVENUE |
|---|---|---|
| FY December 31, 2013 | $286.9 Million | $3.2 Million |
| January 31, 2014 | $76.9 Million | $2.2 Million |
| June 30, 2014 | $80.0 Million | $1.8 Million |
| September 30, 2014 | $82.1 Million | $4.6 Million |
| 3 Mos. December 31, 2014 | $90.1 Million | $7.7 Million |
| FY December 31, 2014 | $329.1 Million | $16.3 Million |
| January 31, 2015 | $87.3 Million | $3.8 Million |
| June 30, 2015 | $91.4 Million | $10.8 Million |
| September 30, 2015 | $92.4 Million | $9.1 Million |
| 3 Mos. December 31, 2015 | $97.7 Million | not disclosed |
| FY December 31, 2015 | $368.8 Million | not disclosed |
| *Total:* | | *$43.2 Million* |

59.     And while comScore's nonmonetary revenue grew in absolute terms during the relevant period, it grew even faster as a proportion of comScore's reported growth in revenue:

| REPORTING PERIOD ENDED | NONMONETARY REVENUE | REPORTED GROWTH FROM SAME PERIOD IN PRIOR YEAR | NONMONETARY REVENUE AS PERCENTAGE OF GROWTH |
|---|---|---|---|
| FY December 31, 2013 | $3.2 million | $31.7 million | *10.1%* |
| January 31, 2014 | $2.2 million | $8.1 million | *27.2%* |
| June 30, 2014 | $1.8 million | $10.1 million | *17.8%* |
| September 30, 2014 | $4.6 million | $10.5 million | *43.8%* |
| 3 Mos. December 31, 2014 | $7.7 million | $13.6 million | *56.6%* |
| FY December 31, 2014 | $16.3 million | $42.2 million | *38.6%* |
| January 31, 2015 | $3.8 million | $10.4 million | *36.5%* |
| June 30, 2015 | $10.8 million | $12.6 million | *85.7%* |
| September 30, 2015 | $9.1 million | $10.3 million | *88.3%* |
| FY December 31, 2015 | not reported | not reported | not reported |
| *Total:* | *$43.2 million* | *$107.2 million* | |

60.    *Nonmonetary Transactions* ("ASC 845") is a provision of GAAP that governs revenue recognition when an issuer does not receive a payment of cash or other monetary assets or liabilities for goods or services.  Such nonmonetary transactions involve either of the following:

a) An exchange with another entity (reciprocal transfer) that involves principally nonmonetary assets or liabilities

b) A transfer of nonmonetary assets for which no assets are received or relinquished in exchange (nonreciprocal transfer).

ASC 845-10-05-2.

61.    While fair value is ordinarily used to measure a nonmonetary transaction, ASC 845 lists three conditions in which the recorded amounts, otherwise referred to as "historical costs," of assets exchanged should be used in measuring nonmonetary transactions in place of fair value:

A nonmonetary exchange shall be measured based on the recorded amount . . . of the nonmonetary asset(s) relinquished, and not on the fair values of the exchanged assets, if any of the following conditions apply:

a. The fair value of neither the asset(s) received nor the asset(s) relinquished is determinable within reasonable limits.

b. The transaction is an exchange of a product or property held for sale in the ordinary course of business for a product or property to be sold in the same line of business to facilitate sales to customers other than the parties to the exchange.

- 26 -

c. The transaction lacks commercial substance.

ASC 845-10-30-3; *see also* ASC 845-10-30-4 (defining "commercial substance" to mean "the entity's future cash flows are expected to significantly change as a result of the exchange").

62.     Defendants repeatedly stated in the financial reports comScore filed with the SEC that they were recognizing revenues from the nonmonetary transactions based on the "fair value" of either the assets surrendered or the assets received in those barter deals in accordance with ASC 845, stating, in pertinent part as follows, for example:

> The Company accounts for nonmonetary transactions under ASC 845, Nonmonetary Transactions. Nonmonetary transactions with commercial substance are recorded at the estimated fair value of assets surrendered including cash, if cash is less than 25% of the fair value of the overall exchange, unless the fair value of the assets received is more clearly evident, in which case the fair value of the asset received is used.

63.     However, in the fall of 2016 comScore admitted that in reality Defendants had been improperly recognizing the revenue and related expenses associated with these nonmonetary transactions, which revenues should have been "accounted for at historical cost rather than at fair value," and since "[t]here [was] no historical cost basis associated with the assets that the Company exchanged," "therefore there should [have been] no revenue recognized or expenses incurred for those transactions."

64.     Additionally, comScore admitted in November 2016 that the Company also inaccurately accounted for certain monetary transactions that will also be corrected when the Company completes its restatement. These monetary transactions principally relate to the timing of revenue recognition. One of these transactions involved over-delivery of data that recurred in multiple periods, two others included potential undisclosed additional arrangements that required contemporaneous contracts to be accounted for as a single arrangement, and one related to partially delayed invoicing for delivered data inconsistent with the terms of the contract.

65.     Defendants also concealed that comScore's transactions with Acxiom – on whose board of directors Defendant Henderson also sits – was the counterparty to **over half** of the Company's nonmonetary transaction revenue in 2013 and two-thirds of the nonmonetary revenue in 2014.  As such, unbeknownst to investors, for each period, nonmonetary barter transactions with Acxiom – which both comScore and Acxiom enjoyed contemporaneous unilateral abilities to report as they saw fit – were providing an enormous percentage of comScore's total related party revenue. The following chart sets forth the extent of this relationship:

| REPORTING PERIOD ENDED | NONMONETARY REVENUE | RELATED-PARTY NONMONETARY REVENUE | RELATED-PARTY PERCENTAGE OF NONMONETARY REVENUE |
|---|---|---|---|
| FY December 31, 2013 | $3.2 Million | $1.8 Million | *56%* |
| March 31, 2014 | $2.2 Million | $1.7 Million | *77%* |
| June 30, 2014 | $1.8 Million | $1.5 Million | *83%* |
| September 30, 2014 | $4.6 Million | $1.5 Million | *33%* |
| 3 Mos. December 31, 2014 | $7.7 Million | $6 Million | *77%* |
| FY December 31, 2014 | $16.3 Million | $10.7 Million | *66%* |
| March 31, 2015 | $3.8 Million | $2.1 Million | *55%* |
| June 30, 2015 | $10.8 Million | $2.2 Million | *20%* |
| September 30, 2015 | $9.1 Million | $2.3 Million | *25%* |
| *Total:* | *$43.2 Million* | *$19.1 Million* | *44.2%* |

66.     Meanwhile, none the wiser due to Defendants' deception, the market consistently reacted to comScore's supposedly "record" revenues by driving the market price of comScore common stock higher and higher after nearly each announcement:

| REPORTING PERIOD ENDED | ANNOUNCED "RECORD" REVENUE | STOCK PRICE INCREASED |
|---|---|---|
| December 31, 2013 | $286.9 million (FY13) | *5%* |
| January 31, 2014 | $76.9 million | *10%* |
| June 30, 2014 | $80.0 million | *0%* |
| September 30, 2014 | $82.1 million | *7%* |
| December 31, 2014 | $329.1 million (FY14) | *25%* |
| January 31, 2015 | $87.3 million | *15%* |
| June 30, 2015 | $91.4 million | *14%* |
| September 30, 2015 | $92.4 million | *5%* |
| December 31, 2015 | $368.8 million (FY15) | *5%* |

67.     At the same time that Defendants were issuing false statements and causing the price

of comScore common stock to trade at artificially inflated prices, the comScore Board approved a

stock buy-back and caused comScore to purchase **more than four million** comScore shares at the

artificially inflated market prices, thereby causing comScore to overpay an estimated **more than $49**

**million** for those shares as follows (not including any shares repurchased between October 1, 2015

and February 29, 2016 when Defendants finally cancelled comScore's stock repurchase program):

| Reporting Period Ended | Shares Repurchased | Average Price Paid Per Share | Estimated Overpayment[3] |
|---|---|---|---|
| March 31, 2014 | 1,068,599 | $29.46 | $491,555.54 |
| June 30, 2014 | 571,150 | $30.45 | $828,167.50 |
| September 30, 2014 | 87,468 | $33.85 | $424,219.80 |
| December 31, 2014 | 23,865 | $37.71 | $207,864.15 |
| March 31, 2015 | 513,089 | $47.01 | $9,240,732.89 |
| June 30, 2015 | 1,099,764 | $44.06 | $16,562,445.84 |
| September 30, 2015 | 872,505 | $53.47 | $21,350,197.35 |
| | 4,236,440 | | $49,105,183.07 |

68.     Defendants' combined efforts to artificially inflate the market price of comScore

common stock through false financial reporting and to further buttress the stock price through the

stock buy-back had its intended effect, with the shares ultimately reaching an all-time high of more

than $64 per share in early August 2015:



---

[3]     Based on November 30, 2016 market trading price of comScore common stock of $29.

## CERTAIN OF THE DEFENDANTS CASH-IN ON THE STOCK INFLATION

69.     Meanwhile, with the price of comScore common stock artificially inflated, certain of the Company's senior executives and directors cashed in, including the Selling Shareholder Defendants who collectively sold more than 2.1 million shares of their personally-held shares, reaping *more than $78.3 million* in gross proceeds as follows:

### Defendant Tarpey

| Date | Shares | Price | Proceeds |
| --- | --- | --- | --- |
| 02/04/13 | 8,000 | $15.00 | $120,000 |
| 02/19/13 | 1,000 | $16.20 | $16,200 |
| 03/04/13 | 1,000 | $16.07 | $16,070 |
| 04/01/13 | 1,000 | $16.58 | $16,580 |
| 04/15/13 | 1,000 | $16.65 | $16,650 |
| 04/29/13 | 1,000 | $16.16 | $16,160 |
| 05/13/13 | 1,000 | $18.93 | $18,930 |
| 05/28/13 | 1,000 | $19.96 | $19,960 |
| 06/10/13 | 1,000 | $21.90 | $21,900 |
| 06/24/13 | 1,000 | $22.71 | $22,710 |
| 07/08/13 | 1,000 | $25.14 | $25,140 |
| 07/22/13 | 1,000 | $26.68 | $26,680 |
| 08/05/13 | 1,000 | $29.35 | $29,350 |
| 02/18/14 | 1,500 | $31.18 | $46,770 |
| 03/03/14 | 1,500 | $31.17 | $46,755 |
| 03/17/14 | 1,500 | $31.08 | $46,620 |
| 03/31/14 | 1,500 | $32.95 | $49,425 |
| 04/14/14 | 1,500 | $30.00 | $45,000 |
| 04/28/14 | 1,500 | $29.49 | $44,235 |
| 05/12/14 | 1,500 | $31.39 | $47,085 |
| 05/27/14 | 1,500 | $32.74 | $49,110 |
| 06/09/14 | 1,500 | $33.43 | $50,145 |
| 06/23/14 | 1,500 | $35.96 | $53,940 |
| 07/07/14 | 1,500 | $38.50 | $57,750 |
| 08/04/14 | 1,500 | $36.46 | $54,690 |
| 08/18/14 | 1,500 | $39.41 | $59,115 |
|  | 39,500 |  | $1,016,970 |

### Defendant Henderson

| Date | Shares | Price | Proceeds |
| --- | --- | --- | --- |
| 05/14/14 | 8,049 | $31.29 | $251,853 |
| 08/26/14 | 16,605 | $38.54 | $639,957 |
| 03/06/15 | 11,000 | $50.01 | $550,110 |
|  | 35,654 |  | $1,441,920 |

### Defendant Matta

| Date | Shares | Price | Proceeds |
| --- | --- | --- | --- |
| 05/21/13 | 10,000 | $20.18 | $201,800 |
| 09/05/13 | 34,185 | $28.97 | $990,339 |
| 01/02/14 | 5,087 | $27.99 | $142,385 |
| 04/01/14 | 24,525 | $32.74 | $802,949 |
| 02/19/15 | 17,325 | $51.40 | $890,505 |
| 02/20/15 | 17,260 | $50.95 | $879,397 |
| 03/05/15 | 31,804 | $50.62 | $1,609,918 |
| 03/06/15 | 4,196 | $50.46 | $211,730 |
| 03/16/15 | 8,305 | $49.70 | $412,759 |
| 05/19/15 | 5,000 | $55.80 | $279,000 |
| 08/21/15 | 13,900 | $57.74 | $802,586 |
| 08/21/15 | 27,200 | $56.79 | $1,544,688 |
| 08/21/15 | 10,900 | $58.94 | $642,446 |
| 08/24/15 | 20,960 | $56.00 | $1,173,760 |
|  | 230,647 |  | $10,584,262 |

### Defendant Korn

| Date | Shares | Price | Proceeds |
| --- | --- | --- | --- |
| 02/25/15 | 4,000 | $51.45 | $205,800 |

### Defendant Wesley

| Date | Shares | Price | Proceeds |
| --- | --- | --- | --- |
| 02/24/15 | 12,032 | $51.37 | $618,084 |
| 03/04/15 | 4,100 | $51.65 | $211,765 |
| 03/05/15 | 4,365 | $50.65 | $221,087 |
| 05/11/15 | 660 | $51.65 | $34,089 |
| 05/11/15 | 24,375 | $51.17 | $1,247,269 |
| 05/11/15 | 1,647 | $51.10 | $84,162 |
| 05/13/15 | 72,465 | $52.05 | $3,771,803 |
|  | 119,644 |  | $6,188,259 |

**Defendant Fulgoni**

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| 09/04/13 | 17,100 | $29.45 | $503,595 |
| 09/05/13 | 38,259 | $29.02 | $1,110,276 |
| 09/06/13 | 19,350 | $28.87 | $558,635 |
| 09/09/13 | 25,291 | $27.89 | $705,366 |
| 02/11/14 | 32,140 | $31.03 | $997,304 |
| 02/11/14 | 40,000 | $30.53 | $1,221,200 |
| 02/12/14 | 57,680 | $31.18 | $1,798,462 |
| 02/19/14 | 900 | $32.02 | $28,818 |
| 02/20/14 | 11,700 | $32.02 | $374,634 |
| 02/21/14 | 50,000 | $32.52 | $1,626,000 |
| 02/24/14 | 27,400 | $32.41 | $888,034 |
| 02/26/14 | 5,600 | $33.04 | $185,024 |
| 03/20/14 | 38,100 | $33.11 | $1,261,491 |
| 03/21/14 | 56,300 | $33.51 | $1,886,613 |
| 06/09/14 | 100,000 | $34.19 | $3,419,000 |
| 06/12/14 | 1,600 | $35.05 | $56,080 |
| 06/13/14 | 16,600 | $35.04 | $581,664 |
| 06/16/14 | 9,600 | $35.01 | $336,096 |
| 06/17/14 | 15,400 | $35.03 | $539,462 |
| 06/18/14 | 11,600 | $35.02 | $406,232 |
| 06/19/14 | 16,600 | $35.23 | $584,818 |
| 06/20/14 | 28,600 | $35.29 | $1,009,294 |
| 12/04/14 | 31,800 | $44.51 | $1,415,418 |
| 12/05/14 | 28,200 | $43.94 | $1,239,108 |
| 12/11/14 | 200 | $45.00 | $9,000 |
| 12/18/14 | 30,800 | $45.94 | $1,414,952 |
| 12/19/14 | 17,000 | $47.03 | $799,510 |
| 12/26/14 | 3,600 | $48.02 | $172,872 |
| 06/04/15 | 14,000 | $57.18 | $800,520 |
| 06/05/15 | 1,000 | $57.05 | $57,050 |
| 06/11/15 | 900 | $58.00 | $52,200 |
| 07/17/15 | 4,100 | $58.39 | $239,399 |
| 07/17/15 | 5,000 | $59.09 | $295,450 |
| 08/05/15 | 5,858 | $62.02 | $363,313 |
| 08/05/15 | 7,000 | $61.04 | $427,280 |
| 08/05/15 | 6,000 | $60.00 | $360,000 |
| 08/11/15 | 2,144 | $62.00 | $132,928 |
| 08/14/15 | 9,000 | $63.02 | $567,180 |
| 08/17/15 | 10,000 | $64.08 | $640,800 |
| | 796,422 | | $29,065,078 |

**Defendant Abraham**

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| 09/04/13 | 17,100 | $29.44 | $503,424 |
| 09/04/13 | 17,100 | $29.44 | $503,424 |
| 09/05/13 | 38,168 | $29.02 | $1,107,635 |
| 09/05/13 | 38,259 | $29.02 | $1,110,276 |
| 09/06/13 | 19,186 | $28.87 | $553,900 |
| 09/06/13 | 10,025 | $28.92 | $289,923 |
| 09/09/13 | 39,219 | $27.86 | $1,092,641 |
| 09/10/13 | 60,000 | $28.10 | $1,686,000 |
| 09/11/13 | 50,000 | $28.18 | $1,409,000 |
| 09/12/13 | 50,000 | $28.21 | $1,410,500 |
| 02/11/14 | 15,000 | $30.03 | $450,450 |
| 02/19/14 | 3,900 | $32.00 | $124,800 |
| 02/20/14 | 11,100 | $32.01 | $355,311 |
| 03/03/14 | 26,700 | $31.52 | $841,584 |
| 03/04/14 | 57,687 | $32.27 | $1,861,559 |
| 03/05/14 | 60,000 | $31.89 | $1,913,400 |
| 03/06/14 | 62,900 | $31.54 | $1,983,866 |
| 03/07/14 | 10,400 | $31.40 | $326,560 |
| 03/31/14 | 20,000 | $32.83 | $656,600 |
| 04/01/14 | 40,986 | $32.76 | $1,342,701 |
| 04/02/14 | 45,297 | $32.34 | $1,464,905 |
| 04/07/14 | 5,221 | $31.28 | $163,313 |
| 04/09/14 | 37,544 | $32.01 | $1,201,783 |
| 12/04/14 | 12,899 | $44.52 | $574,263 |
| 03/16/15 | 2,377 | $49.74 | $118,232 |
| 03/16/15 | 10,000 | $49.56 | $495,600 |
| 03/17/15 | 5,000 | $49.56 | $247,800 |
| 03/18/15 | 1,648 | $49.73 | $81,955 |
| 03/20/15 | 5,000 | $49.24 | $246,200 |
| 03/20/15 | 5,221 | $49.36 | $257,709 |
| 03/23/15 | 2,729 | $49.78 | $135,850 |
| 04/02/15 | 36,610 | $50.84 | $1,861,252 |
| 04/08/15 | 27 | $52.38 | $1,414 |
| 04/08/15 | 522 | $51.26 | $26,758 |
| 05/15/15 | 50,000 | $54.25 | $2,712,500 |
| 05/18/15 | 13,732 | $54.68 | $750,866 |
| | 881,557 | | $29,863,956 |

70.     Defendants Matta and Wesley, who had both joined the Company in 2014, were also unjustly enriched as a result of the artificial stock price inflation through their receipt of improper stock option and RSU vesting.  As identified by the *Wall Street Journal* in July 12, 2016 and August 31, 2015 exposés detailing how a material and growing portion of comScore's reported revenues

were the result of nonmonetary transactions and challenging comScore's accounting for those nonmonetary transactions, as comScore's share price continued to climb in response to its steady reports of "record" revenues augmented by those growing nonmonetary transactions, Defendants Matta and Wesley obtained outsized executive compensation under the terms of their respective employment agreements.

71.     On November 7, 2014, under the direction of Defendant Henderson in his role as chair of comScore's Compensation Committee, Defendants Matta and Wesley had been awarded lucrative stock options and RSUs that only vested if the average daily closing price of comScore common stock exceeded targets of $48, $50, $55, or $60 over varied 30 consecutive calendar-day periods.  Though comScore common stock was only trading at approximately $43 per share when those lucrative awards were made in November 2014, as comScore continued to report quarter after quarter of "record" revenue growth fueled by the false financial reporting and buttressed by the stock buy-backs, the market price of comScore common stock rose to meet *all four* of those price targets so that *all four blocks* of shares granted to Defendants Matta and Wesley qualified for vesting or exercising between March and August 2015:



- 32 -

72.     As a result, Defendants Matta and Wesley received the improper vesting on millions of dollars of stock options and RSUs, collectively receiving shares valued at more than $9 million over a period lasting less than six months:

| TIER | VESTING DATE | VESTED SHARES RECEIVED BY DEFENDANT MATTA | VALUE OF DEFENDANT MATTA'S VESTED SHARES | VESTED SHARES RECEIVED BY DEFENDANT WESLEY | VALUE OF DEFENDANT WESLEY'S VESTED SHARES |
|---|---|---|---|---|---|
| $48 | March 1, 2015 | 68,401 | $3,283,248 | 15,112 | $725,376 |
| $50 | March 8, 2015 | 13,686 | $684,300 | 3,148 | $157,400 |
| $55 | June 6, 2015 | 31,091 | $1,710,005 | 6,927 | $380,985 |
| $60 | August 23, 2015 | 28,500 | $1,710,000 | 6,297 | $377,820 |
| *Total:* | | *$141,678* | *$7,387,553* | *$31,474* | *$1,641,581* |

## THE TRUTH BEGINS TO BE REVEALED

73.     On November 25, 2015, the SEC sent a letter to comScore addressed to Defendant Matta questioning certain representations made in the Company's annual financial report for FY 2014 ended December 31, 2014.  The SEC first noted that comScore "state[d] that of $16.3 million in revenue related to non-monetary transactions during 2014, $10.7 million of that amount [was] attributable to a single related party transaction," and that the SEC was "unable to locate disclosure regarding these transactions in [comScore's] related party transactions disclosure included in [its] amended 10-K filed on April 24, 2015."  The inquiry referenced Item 404(a) of SEC Regulation S-K requiring additional disclosures concerning "any transaction, since the beginning of the registrant's last fiscal year, or any currently proposed transaction, in which the registrant was or is to be a participant and the amount involved exceeds $120,000, and in which any related person had or will have a direct or indirect material interest."

74.     The SEC letter went on to make two additional inquires as to comScore's "Revenue Recognition" for nonmonetary transactions, stating, in pertinent part, as follows:

Please tell us what consideration you gave to breaking out the impact of non-monetary transactions in your presentation of results of operations for the periods presented.

*        *        *

We note from your disclosures that you have non-monetary transactions.  Describe the nature of the date exchanges that are being accounted for as non-monetary transactions.  Indicate whether these transactions are similar to your typical revenue transactions.  Consider revising your disclosures to clarify the nature of the non-monetary transactions.  We refer you to ASC 845-10-50-1.

75.      In the Company's response to the SEC dated December 3, 2015, as to the SEC's initial inquiry regarding related party transaction disclosures, Defendants responded revealing that one of comScore's directors was affiliated with the counterparty to the lion's share of the nonmonetary transactions, but refused to publicly disclose the name of that director or the entity he was affiliated with, only stating, in pertinent part, as follows:

The Company supplementally advises the Staff that such disclosure relates to a contract by and between the Company and [****] (the "Customer") . [****] is a director of the Company and also a director of the Customer (the "Related Person"), which would make him a "related person" under Instruction 1 to Item 404(a). However, the Related Person did not and is not expected to have a material direct or indirect interest in the Company's transaction with the Customer.  As of [****], 2015, the Related Person beneficially owned only [****] shares of the Customer, or [****]% of its outstanding shares. During the fiscal year ended March 31, 2015, the Related Person earned $[****] in total compensation from the Customer for services as a member of its board of directors, all consistent with the disclosed director compensation policies of the Customer.  The Related Person did not disclose any further interest in the Customer to the Company, nor is the Company aware of further interest by the Related Person in the Customer or the referenced transaction with the Customer.  Accordingly, the Company respectfully submits that the Related Person did not have a direct material interest in the referenced transaction, and in reliance upon Instruction 6 to Item 404(a), the Related Person did not have an indirect material interest in the referenced transaction since such person's only relationship arose as a director of the Customer and a beneficial owner of less than 10% of the equity interest in the Customer.

The Company supplementally advises the Staff that it referenced the relationship in its financial statements in the interest of providing additional disclosure of the relationship regarding the Customer and the Related Person notwithstanding that such disclosure was not otherwise required pursuant to Item 404(a).

- 34 -

76.     On December 3, 2015, Defendants responded to the SEC arguing that the nonmonetary transactions were too "immaterial" and as such, they had not been disclosing them at all prior to the report for the quarter ended June 30, 2015 when revenues from those transactions reached 10% of total revenues, and even then had only made minimal disclosures thereafter, ***though maintaining the revenues from the nonmonetary transactions had all been appropriately accounted for***.   Defendants' letter stated in pertinent part as follows:

> The Company supplementally advises the Staff that it considered the impact of its nonmonetary transactions during the year ended December 31, 2014 and ***concluded that such transactions were immaterial to an understanding of the Company's operations as a whole during the period presented in the discussion of Results of Operations presented in the 2014 Form 10-K***.  The Company advises the Staff that the revenue from such transactions represented less than 5% of total revenue during the year ended December 31, 2014.  Notwithstanding, the Company disclosed the overall effect in its Summary of Significant Accounting Policies in the discussion of its policy regarding nonmonetary transactions.  ***The Company supplementally advises the Staff that it first began disclosing the amount of its nonmonetary revenue and associated expenses in the discussion of its Results of Operations in its Quarterly Report on Form 10-Q for the quarter ended June 30, 2015.  This disclosure was prompted when the Company's nonmonetary revenue exceeded 10% of its total revenue for the first time in a given period and the Company determined such detail may enhance a reader's understanding of its results of operations.***  Accordingly, the Company increased the prominence of the disclosure. However, the overall details were generally consistent with prior disclosures since the Company had historically broken out nonmonetary transactions in the notes to its financial statements and the summary of significant accounting policies included in its Managements' Discussion and Analysis of Financial Condition and Results of Operations section.
>
> The Company will continue to carefully evaluate on a quarterly basis if additional disclosure regarding the extent and nature of its nonmonetary transactions should be described in the Results of Operations section or otherwise in its quarterly and annual reports.
>
> ***The Company supplementally advises the Staff that all of its nonmonetary transactions were consistent with its typical forms of transactions with data source providers for which costs are recognized and customer transactions for which revenue is recognized.  Accordingly, the Company determined that the disclosure in the Results of Operations regarding trends generally otherwise captured the material factors contributing to the changes in the Company's results of operations for the periods presented in the 2014 Form 10-K.***

*          *          *

***All of the Company's nonmonetary transactions were consistent with its typical forms of transactions with data source providers for which costs are recognized and customer transactions for which revenue is recognized***.  As an example, in these types of nonmonetary transactions, the Company provides subscription products and solutions that it typically sells on a cash basis to data source providers in exchange for additional consumer demographics and segmentation data that improves the accuracy and granularity of the Company's products and services, particularly the Company's panel and census data.  ***The Company concluded that such transactions were consistent with its accounting policies and with the terms of similar transactions with other ordinary course transactions but for the nonmonetary element***.  Notwithstanding, the Company intends to provide additional disclosure in its upcoming Annual Report on Form 10-K for the year ended December 31, 2015 consistent with the Staff's comment affirmatively clarifying the nature of these transactions and that such transactions were conducted on terms otherwise consistent with its typical types of agreements of similar substance.

The letter was signed by comScore's outside counsel with Defendants Matta and Wesley copied.

77.     Suddenly, however, on February 19, 2016, just days after announcing $368.8 million in "record annual GAAP revenue" for FY 2015 on February 17, 2016, Defendants caused comScore to announce in a filing with the SEC that the Board's Audit Committee had commenced an investigation in response to having received tips concerning possible accounting malfeasance.  As a result, Defendants stated that comScore would not be able to timely file its 2015 annual report with the SEC.

78.     Defendants again delayed filing the 2015 annual report in March, May and June 2016, stating each time that the Audit Committee had not yet finished its review, despite the NASDAQ having notified comScore in March 2016 that it was not in compliance with its listing agreement and that comScore common stock would be delisted unless its 2015 annual report was filed within 60 days.

79.     On July 22, 2016, comScore suddenly and without explanation announced that its co-founder, Defendant Abraham, was stepping down as Chairman of the Board to focus on other things.

80.     In August 2016, Defendants once again announced that they would need additional time to file the Company's 2015 annual report and its interim financial statements for the first and second quarter of 2016, this time disclosing they had hired outside legal counsel and auditing professionals to assist the Audit Committee with its investigation.  Defendants revealed that the Board had identified some misreporting of nonmonetary revenue – primarily barter transactions. comScore also disclosed that it had named co-founder Defendant Fulgoni as a replacement for then-CEO Defendant Matta as CEO.  Then-Executive Vice Chairman of the Board Defendant Livek, who had only recently joined comScore in connection with comScore's acquisition of Rentrak, would also assume responsibilities for the Company's strategic and day-to-day operations.  comScore also replaced CFO Defendant Wesley with new CFO Defendant Chemerow in August 2016.

81.     On September 2, 2016, Defendants announced that comScore had received a delisting notice from the NASDAQ because they had failed to bring comScore's SEC filings current and that they planned to appeal.

82.     On September 15, 2016, Defendants announced that the Board's Audit Committee had concluded that all of comScore's previously-issued financial statements for fiscal years 2013 and 2014, along with the first three interim reporting periods of fiscal 2015 and the FY 2015 financial results report it had issued on February 23, 2016, could no longer be relied upon and that the prior financial statements would have to be restated because they erroneously recognized revenue from nonmonetary transactions that should never have been recognized in violation of GAAP.  In so conceding, Defendants revealed that in order to correct the "errors" in comScore's accounting for nonmonetary transactions, the Company would be forced to wipe out *all of the previously recognized nonmonetary revenue* it had previously recognized and reported.

83.     Specifically, Defendants admitted that they lacked a reliable basis to determine the fair value of the assets they had caused comScore to surrender in the nonmonetary transactions because the Company had not made comparable cash sales; that they did not have a reliable basis to determine the fair value of the assets comScore had acquired in the nonmonetary transactions because the counterparties to those transactions had not made comparable cash sales; that the nonmonetary transactions lacked commercial substance because the data Defendants acquired was less valuable than they had previously represented; and that comScore did not have a historical cost basis for the data it delivered in the nonmonetary transactions.

84.     As a result, the Company then reported that *the entire $43 million* in nonmonetary revenue Defendants had caused comScore to report in its prior financial statements had been recognized in violation of GAAP.  Of that more than $43 million in nonmonetary revenue that the Company has now admitted was improperly recognized, more than $19 million—*nearly half*—was derived from transactions with Acxiom alone.  The following chart sets forth the financial impact of Defendants' fraudulent accounting for nonmonetary transactions:

| REPORTING PERIOD ENDED | REVENUES | | (LOSS) INCOME FROM OPERATIONS | |
|---|---|---|---|---|
| | AS PREVIOUSLY REPORTED | AS ADJUSTED | AS PREVIOUSLY REPORTED | AS ADJUSTED |
| FY December 31, 2013 | $286.86 Million | $283.615 Million | $3.093 Million | $1.644 Million |
| FY December 31, 2014 | $329.151 Million | $312.9 Million | ($14.78 Million) | ($14.768 Million) |
| March 31, 2015 | $87.329 Million | $83.532 Million | ($9.19 Million) | ($8.816 Million) |
| June 30, 2015 | $91.414 Million | $80.649 Million | ($2.818 Million) | ($8.593 Million) |
| September 30, 2015 | $92.405 Million | $83.310 Million | $2.243 Million | ($1.722 Million) |
| 3 Mos. December 31, 2015 | $97.669 Million | $92.362 Million | $7.115 Million | $8.332 Million |
| FY December 31, 2016 | $368.817 Million | $339.853 Million | ($2.650 Million) | ($10.799 Million) |

85.     In the ensuing weeks, Defendants would claim that comScore's outgoing CEO and CFO had merely "resigned from employment with the Company for Good Reason" in connection with the "change of control" that occurred due to the Rentrak acquisition in early 2016 – *despite the fact that they had both been terminated upon the Board's purported discovery of the financial*

*chicanery.*  Because the Board deemed both of those terminations "for Good Reason," and because the Board entered into mutual "non-disparagement" agreements and releases with each of those departing executives that forbade them from disclosing the other Defendants' complicity in their misconduct, comScore would be forced to pay each of those faithless fiduciaries hundreds of thousands of dollars in severance benefits.  Specifically, Defendant Matta would receive his then-current annual salary of $496,000 for a period of 24 months following his separation, or $992,000, along with ongoing COBRA medical insurance payments and any vested stock options and RSUs (including those that had been improperly vested); and Defendant Wesley would receive his then-current annual salary of $334,400 for a period of 15 months following his separation, or $418,000, along with ongoing COBRA medical insurance payments and any vested stock options and RSUs (including those that had been improperly vested).

86.     On November 17, 2016, the newly appointed Chairman of comScore's Board, Defendant Lewis, along with fellow Board member Defendant Gottesman, both suddenly and without explanation resigned.  On November 18, 2016, Defendant Henderson was appointed Chairman of the Board.

87.     On November 23, 2016, comScore announced that it had identified more improper accounting as to certain monetary transactions, stating, in pertinent part, that "the accounting treatment for certain monetary transactions [would] need to be adjusted, principally relating to the timing of revenue recognition," that "[o]ne of these transactions involved over-delivery of data that recurred in multiple periods, two others included potential undisclosed additional arrangements that required contemporaneous contracts to be accounted for as a single arrangement, and one related to partially delayed invoicing for delivered data inconsistent with the terms of the contract."

88.     On November 23, 2016, comScore announced that its "Audit Committee's investigation also identified concerns regarding internal control deficiencies, ***including concerns about tone at the top***; errors in judgment identified with respect to issues reviewed; information not having been provided to the Company's accounting group and its external auditors; and the sufficiency of public disclosures made by the Company about certain performance metrics."

89.     On December 5, 2016, the Company suddenly announced that Defendant Abraham had resigned his board seat effective immediately.

90.     As of the filing of this Complaint, comScore has still been unable to fully quantify the required financial restatements or to bring its financial filings with the SEC current and the NASDAQ is still threatening to permanently delist the Company's common stock if those filings are not brought current by February 23, 2017.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

91.     Plaintiff brings this action derivatively in the right and for the benefit of comScore to redress injuries suffered and to be suffered by comScore as a direct result of Defendants' violations of state and federal law, breaches of fiduciary duties, abuse of control, constructive fraud, gross mismanagement, corporate waste and unjust enrichment, as well as the aiding and abetting thereof, by the Defendants.  This is not a collusive action to confer jurisdiction on this Court, which it would not otherwise have.

92.     Plaintiff will adequately and fairly represent the interests of comScore and its shareholders in enforcing and prosecuting its rights.

93.     Plaintiff is an owner of comScore stock and was an owner of comScore stock during times relevant to Defendants' illegal and wrongful course of conduct alleged herein.

94.     Based upon the facts set forth throughout this Complaint, applicable law and the longstanding rule that equity does not compel a useless and futile act, a pre-filing demand upon the

comScore Board of Directors to institute this action against the officers and members of the comScore Board of Directors is excused as futile.  A pre-filing demand would be a useless and futile act because:

        (a)       comScore's 2015 Annual Proxy Statement to shareholders expressly concedes that Defendant Fulgoni is not independent due to his executive positions with the Company and his relationships with and dependence upon the other members of the Board for his livelihood. Likewise, Rentrak's last annual proxy statement to its shareholders expressly conceded that Defendant Livek was not independent due to his executive positions with Rentrak and his relationships with and dependence upon its board members for his livelihood.  For the same reasons, though Defendant Livek was not yet on the comScore Board when its 2015 Proxy was issued – and the Company has not yet held a 2016 annual general shareholder meeting much less mailed out a Proxy statement for 2016 – Defendants Fulgoni and Livek are not independent.

        (b)       By virtue of the facts that in addition to serving on the comScore Board, Defendant Engel also serves as chairman of the board and is a minority owner of Consumer Orbit LLC ("Consumer Orbit"), a Kansas City-based marketing information aggregator with a focus on the relationship between existing consumer databases and consumer generated transactions-based data that both partners with and uses Rentrak's/comScore's local markets and national television ratings systems to service its own customers, he too is not independent.  In that capacity, Defendant Engel was serving as a consultant to Rentrak at the time of the acquisition and upon information and belief he continues to serve as a consultant to comScore.  Indeed, Rentrak's last Annual Proxy Statement to shareholders expressly conceded that Defendant Engel was not independent due to his executive positions with Consumer Orbit and that company's business relationships with and dependence upon Rentrak (now comScore) for his livelihood, further stating in pertinent part as follows:

In February 2010, Mr. Engel began providing services as an independent consultant to assist Rentrak in combining its sources of data for its TV Essentials™ product under a three-year agreement with Consumer Orbit L.L.C., of which Mr. Engel is Chairman.  The consulting fee under the agreement was $10,000 per month, which was reduced to $6,000 per month (or $72,000 per year) upon Mr. Engel's election as a director of Rentrak in August 2010. . . .  In addition, as part of his consulting arrangement, on June 8, 2011 and June 17, 2011, we granted to Mr. Engel stock options to purchase 5,000 and 15,000 shares of our common stock, respectively, with a grant date fair market value of $60,126 and $141,599, respectively, and in June 2015, we granted Mr. Engel 14,678 restricted stock units with a grant date fair market value of $1.0 million. ***After considering these compensation arrangements and input from the Nominating and Governance Committee, the board has concluded that Mr. Engel is not an "independent director" under applicable Nasdaq listing standards as of June 11, 2015***.

(c)     By virtue of the facts that Defendant Fradin: (i) is a former executive of comScore, having served as its Executive Vice President, Corporate Development from 2000-2004; (ii) is a co-founder of and now serves as CEO and chairman of the board of directors of Dynamic Signal, a software company which provides marketing solutions for brands, which according to Dynamic Signal's November 13, 2013 press release counted comScore as a "customer win," and cited Defendant Matta stating that "Dynamic Signal's Employee Advocacy solution empowers over 1000 Comscore employees to be brand advocates by making it easy and convenient for our staff to be social through iOS and Android mobile apps, an employee hub, and through our existing portals and intranets," and that comScore had "seen a significant return on investment because Dynamic Signal's VoiceStorm platform help[ed] [comScore] expand [its] reach and [drove] social sales because [its] sales and marketing teams [could] now identify, engage, nurture and win new customers through their personal social networks," and (iii) Defendant Fradin's livelihood at Dynamic Signal is in large part dependent upon his company's ongoing business with comScore and his relationships with its senior executives and directors, Defendant Fradin could not competently investigate the claims against the other Defendants alleged herein.

(d)     By virtue of the facts that the lion's share of the nonmonetary transactions comScore participated in were conducted with a single counterparty, Acxiom, upon whose board of directors Defendant Henderson sits, Defendant Henderson is not disinterested because he was both intimately knowledgeable of all aspects of those nonmonetary barter transactions, directly oversaw those transactions and the accounting for them, and is potentially liable for facilitating the nonmonetary barter transactions and the improper accounting for those transactions.

(e)     Having sold stock at fraud-inflated prices while in possession of material non-public information concerning comScore's accounting malfeasance and revenue overstatements, Insider Selling Defendants Fulgoni, Henderson and Korn face potential liability for violations of the federal securities laws and insider trading prohibitions and as such are not disinterested in the outcome of allegations that they, or any of the other Insider Selling Defendants, violated the federal securities laws by selling stock while in possession of material non-public information.

(f)     As members of the Rentrak Board of Directors in September 2015, Defendants Livek, Engel and Rosenthal each received the detailed Grant Thornton due diligence report raising several red flags as to comScore's revenue recognition as detailed *infra* at ¶54.

(g)     By virtue of the facts that Defendant Fulgoni sits on the Board of Directors of Dynamic Signal where Defendant Fradin serves as CEO and chairman of the board, has personally made venture capital investments in Dynamic Signal, and where Defendant Fulgoni decides Defendant Fradin's annual compensation, upon which Defendant Fradin is wholly dependent upon for his livelihood, Defendant Fradin is not independent of Defendant Fulgoni and could not competently consider a demand to bring suit against Defendant Fulgoni or the other Board Members for the claims alleged herein.

(h)     By virtue of the fact that Defendant Korn has been employed as the president of Ronald Korn Consulting located in Boca Raton, Florida since July 1991, where according to his LinkedIn page resume, for his livelihood he "[p]rimarily sit[s] on boards of directors and chair audit committees of public companies," which according to his LinkedIn page includes comScore, Ocwen Financial Corporation ("Ocwen") and Petmeds, where Defendant Fulgoni, co-founder of comScore also serves on the Petmeds Board, Defendant Korn's positions on, not just one, but two of the three boards of directors where he serves as chairman of the audit committee would be jeopardized if he decided to bring suit against Defendant Fulgoni and the other Defendants.  Indeed, Defendant Korn was recently charged in his capacity as the chairman of the Ocwen Board's audit committee with breaching his fiduciary duties in causing or permitting Ocwen to commit a massive securities fraud where Defendant Korn and the rest of the Ocwen Board are charged with "concealing from shareholders and the investing public known failures with respect to the Company's compliance with state and federal regulations governing the servicing of mortgage loans, failing to establish adequate internal controls, permitting Ocwen's now former Chairman and Chief Executive Officer . . . Erbey, to participate and direct a series of improper self-dealing transactions between Ocwen and companies in which . . . Erbey had significant ownership interests and allowing insiders to trade on material adverse inside information" and further, "[n]otwithstanding both government regulations and multiple regulatory decrees requiring Ocwen's compliance with servicing guidelines . . . ignor[ing] multiple red flags" with respect to "Ocwen's non-compliance and permitt[ing] Ocwen's continued violations of state and federal law."  *See In re Ocwen Derivative Action Litig.,* SDFL No. 14-CV-81601-WPD, Consolidated Verified Shareholder Derivative Complaint, filed March 8, 2016, ECF No. 143, at ¶¶1, 2, 123, 195.  In the *Ocwen* derivative action, a demand was made on the Ocwen Board to bring suit but Defendant Korn and the other Ocwen board members wholly failed to

respond to that demand, much less to take any action against Ocwen's faithless fiduciaries, and ultimately sought dismissal of the claims against them and Ocwen's other faithless fiduciaries. After Ocwen was placed under a consent order with the New York Department of Financial Services as a result of the securities fraud and plaintiffs charged Defendant Korn with being complicit with the misconduct, Defendant Korn was removed from the special litigation committee the Ocwen Board had empanelled to investigate the fraud precisely because he lacked independence. Here too, by virtue of his livelihood being incumbent upon continuing to be invited to serve as Audit Committee Chair of various boards, Defendant Korn is not independent and could not be called upon to competently and independently investigate and bring the claims being alleged herein.

(i)     By virtue of the fact that in addition to being a member of the comScore Board (and had previously been a director of Rentrak since 2008, including serving as the non-executive chairman of its board), Defendant Rosenthal is also a partner at W.R. Huff Asset Management Co., LLC ("W.R. Huff"), one of comScore's largest shareholders, Defendant Rosenthal is not independent. W.R. Huff, an employee owned investment manager, owns more than 1.1 million shares of comScore common stock, or approximately 2% of its outstanding shares. According to Defendant Rosenthal's bio with *Bloomberg*, he "plays a key role in WRH Asset Management's investment activities in a wide variety of media and communications companies in the areas of media measurement, cable television, outdoor advertising, content, television and radio broadcasting, satellite communications and wireless communications." Specifically, "[f]rom 2006 to June 2012, he served as an Advisor to and Observer of the Board of Directors of Virgin Media and as a consultant to the company, providing turn-around and crisis-management services, as well as operational and financial analysis and recommendations. From 2007 to 2010, he served as an Advisor to the Executive Management of Time Warner Cable. From August 1997 to March 2001,

he served as Director of Mergers & Acquisitions at RSL Communications, Ltd. . . .  He has been Chairman at RiceBran Technologies since July 5, 2016 and its Independent Director since July 5, 2016. . . . In 2016, Mr. Rosenthal was named a Money All-Star – a Top 10 media executive in investment banking, private equity and advisory.  In 2009, he was included in Multichannel News' annual '40 Under 40' list for influencing the future of cable and telecommunications."  Based on the fact that Defendant Rosenthal relies upon his positions with W.R. Huff and his ability to procure investment relationships with media and advertising companies, Defendant Rosenthal is not independent and could not be called upon to competently and independently investigate and bring the claims being alleged herein.

(j)      By virtue of the fact that Defendants Henderson, Korn and Rosenthal were members of the Board's Audit Committee which, according to its charter was charged with "oversee[ing] the accounting and financial reporting processes of the Company and audits of the financial statements of the Company" and  with "assist[ing] the Board in oversight and monitoring of (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; . . . and (v) the performance of the Company's internal audit function," Defendants Henderson, Korn and Rosenthal are directly complicit in and potentially liable for the misconduct alleged herein and would not be disinterested in the outcome of an investigation into these claims.

(k)      By virtue of the fact that Defendant Henderson was the Chairman and Defendant Fradin was a member of the Board's Compensation Committee which, despite being charged under the terms of its charter with "discharg[ing] the Board's responsibilities relating to oversight of the compensation of the Company's Chief Executive Officer and other executive officers" and "ensur[ing] that the Company structures its compensation plans, policies and programs

- 46 -

as to . . . promote the success of the Company's business," the Compensation Committee mischaracterized Defendants Matta's and Wesley's terminations as for "Good Reason" and allowed them to walk away with millions of dollars of executive compensation and vested stock options rather than being called upon to indemnify comScore for the misconduct they caused the Company to undertake, Defendants Henderson and Fradin are directly complicit in and potentially liable for he misconduct alleged herein and would not be disinterested in the outcome of an investigation into these claims.

(l)     The members of comScore's Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein.  These are people they have developed professional relationships with, who are their friends and with whom they have entangling financial alliances, interests and dependencies, and therefore, they are not able to and will not vigorously prosecute any such action.

(m)     The comScore Board of Directors and senior management participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from comScore's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.  As a result of their access to and review of internal corporate documents, or conversations and connections with other corporate officers, employees, and directors and attendance at management and/or Board meetings, each of the Defendants knew the adverse non-public information regarding the false financial reporting, the wasteful stock buy-backs and failure to pursue remedies against Defendants Matta and Wesley and to instead deem their separations "for good reason" in order to pay them improper severance benefits.  Pursuant to their specific duties as Board members, the Director

- 47 -

Defendants are charged with the management of the Company and to conduct its business affairs. Defendants breached the fiduciary duties that they owed to comScore and its shareholders in that they failed to prevent and correct the false financial reporting, the wasteful stock buy-backs and failure to pursue remedies against Defendants Matta and Wesley and to instead deem their separations "for good reason" in order to pay them improper severance benefits. Certain directors are also dominated and controlled by other directors and cannot act independently of them. Thus, the comScore Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of its members participated personally in the wrongdoing or are dependent upon other Defendants who did.

(n)     The acts complained of constitute violations of the fiduciary duties owed by comScore's officers and directors and these acts are incapable of ratification.

(o)     The members of comScore's Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.

(p)     Any suit by the current directors of comScore to remedy these wrongs would likely further expose the liability of Defendants under the federal securities laws, which could result in additional civil and/or criminal actions being filed against one or more of the Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

(q)     comScore has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the current Board has not filed any lawsuits against itself

or others who were responsible for that wrongful conduct to attempt to recover for comScore any part of the damages comScore suffered and will suffer thereby.

(r)   In order to properly prosecute this lawsuit, it would be necessary for the directors to sue themselves and the other Defendants, requiring them to expose themselves and their comrades to millions of dollars in potential civil liability and criminal sanctions, or SEC sanctions. This they will not do.  Specifically, each of the members of the current Board are named defendants in the securities fraud class action pending in this District entitled *Fresno Cty. Emps.' Ret. Assoc., et al. v. comScore, Inc., et al.*, No. 1:16-cv-01820-JGK, with Defendant Henderson being charged with violations of §§10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 in connection with comScore's issuance of materially false and misleading statements and financial reports between February 11, 2014 and March 7, 2016; and Defendants Henderson, Fradin, Fulgoni, Korn, Livek, Engel and Rosenthal are charged with violations of §14(a) of the Exchange Act and §11 of the Securities Act in connection with signing and using a materially false and misleading merger proxy statement and registration statement to obtain the approval of comScore and Rentrak shareholders for the Rentrak acquisition and to register the stock provided to Rentrak shareholders as acquisition currency in connection with the Rentrak acquisition.  The participation of each of these Defendants is detailed in the Consolidated Amended Complaint for Violations of the Federal Securities Laws filed in that matter on October 19, 2016 (at ECF No. 83) and those allegations are expressly incorporated herein by reference.

(s)   comScore's current and past officers and directors are protected against personal liability for their acts of mismanagement, waste and breaches of fiduciary duties alleged in this Complaint by directors' and officers' liability insurance which they caused the Company to purchase for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of

comScore.  However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the Defendants in this case contain provisions which eliminate coverage for any action brought directly by comScore against these Defendants, known as, *inter alia*, the "insured versus insured exclusion."  As a result, if these directors were to sue themselves or certain of the officers of comScore, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate a recovery.

(t)      In order to bring this action for breaching their fiduciary duties, the members of the comScore Board would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the Company, who are their personal friends and with whom they have entangling financial alliances, interests and dependencies, which they would not do.

95.      Plaintiff has not made any demand on shareholders of comScore to institute this action since such demand would be a futile and useless act for the following reasons:

(a)      comScore is a publicly traded company with approximately 39 million shares outstanding, and thousands of shareholders;

(b)      making demand on such a number of shareholders would be impossible for Plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)      making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Violations of §10(b) and Rule 10b-5 of the Exchange Act
### Against the Officer Defendants

96.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

97.     Throughout the relevant period, the Officer Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify comScore's financial reporting.

98.     The Officer Defendants employed devices, schemes and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about comScore not misleading.

99.     The Officer Defendants, as top executive officers and directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers of the Company, each of the Officer Defendants was able to and did control the conduct complained of herein and the content of the public statements disseminated by comScore.

100.     The Officer Defendants acted with scienter throughout the relevant period, in that they either had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  Specifically, under GAAP, a "restatement" is a term of art used only where a company's previously issued financial statements

were materially false as of the time of issuance and the misstatements were based on "facts that existed at the time the financial statements were prepared."  In this case, comScore has announced that it will be issuing a broad restatement because "the Company cannot support the prior accounting for the nonmonetary transactions recorded by the Company during the years ended December 31, 2013, 2014, and 2015."  The Company's Audit Committee has determined that comScore's "revenue and expenses associated with *all nonmonetary transactions* during the periods identified above should be reversed and accounted for at historical cost rather than at fair value."  comScore has since identified additional monetary transactions that were improperly accounted for where revenue was improperly recognized.  As revealed on November 23, 2016, the Audit Committee's investigation expressly "identified concerns regarding internal control deficiencies, *including concerns about tone at the top* . . . ."  The Officer Defendants were among the senior management of the Company, and were therefore directly responsible for the false and misleading statements and/or omissions disseminated to the public through press releases, news reports and filings with the SEC.

101.    Each of the Officer Defendants participated in a scheme to defraud with the purpose and effect of defrauding comScore.

102.    By virtue of the foregoing, the Officer Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

## COUNT II

### Violations of §20(a) of the Exchange Act Against the Officer Defendants

103.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

104.    The Officer Defendants, by virtue of their positions with comScore and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of comScore within the

meaning of §20(a) of the Exchange Act.  They had the power and influence and exercised the same to cause comScore to engage in the illegal conduct and practices complained of herein.

### COUNT III

### Breaches of Fiduciary Duties and/or Aiding and Abetting
### Against All Defendants

105.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

106.    Each of the Defendants agreed to and did participate with Defendants Matta and Wesley and the other Defendants and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets in breaches of fiduciary duties the Defendants owed to the Company.

107.    The Defendants have violated fiduciary duties of care, loyalty, candor and independence owed to comScore and its public shareholders, have engaged in unlawful self-dealing and have acted to put their personal interests and/or their colleagues' interests ahead of the interests of comScore and its shareholders.

108.    As demonstrated by the allegations above, Defendants failed to exercise the care required, and breached their duties of loyalty, good faith, candor and independence owed to comScore and its public shareholders, and they failed to disclose material information and/or made material misrepresentations to shareholders regarding comScore's falsified financial reporting.

109.    By reason of the foregoing acts, practices and course of conduct, the Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward comScore and its public shareholders.

110.    As a proximate result of Defendants' conduct, in concert with Defendants Matta and Wesley, comScore has been injured and is entitled to damages.

**COUNT IV**

**Abuse of Control Against All Defendants**

111.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

112.    The Defendants employed the alleged scheme for the purpose of maintaining and entrenching themselves in their positions of power, prestige and profit at, and control over, comScore, and to continue to receive the substantial benefits, salaries and emoluments associated with their positions at comScore.  As a part of this scheme, Defendants actively made and/or participated in the making of, or aided and abetted the making of, misrepresentations regarding comScore.

113.    Defendants' conduct constituted an abuse of their ability to control and influence comScore.

114.    By reason of the foregoing, comScore has been damaged.

**COUNT V**

**Gross Mismanagement Against All Defendants**

115.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

116.    Defendants had a duty to comScore and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting, and disclosure controls of comScore.

117.    Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of comScore in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence

and candor in the management and administration of comScore's affairs and in the use and preservation of comScore's assets.

118.    During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused comScore to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to comScore, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged comScore.

119.    By reason of the foregoing, comScore has been damaged.

## COUNT VI

### Constructive Fraud Against All Defendants

120.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

121.    As corporate fiduciaries, Defendants owed to comScore and its shareholders a duty of candor and full accurate disclosure regarding the true state of comScore's business and assets and their conduct with regard thereto.

122.    As a result of the conduct complained of, Defendants made, or aided and abetted the making of, numerous misrepresentations to and/or concealed material facts from comScore's shareholders despite their duties to, *inter alia*, disclose the true facts regarding their stewardship of comScore.  Thus they have committed constructive fraud and violated their duty of candor.

123.    By reason of the foregoing, comScore has been damaged.

## COUNT VII

### Corporate Waste Against All Defendants

124.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

125.    By failing to properly consider the interests of the Company and its public shareholders, by failing to conduct proper supervision, and by giving away millions of dollars to Defendants Matta and Wesley *via* their severance agreement payments and failure to seek indemnity from them for the harm they caused comScore, and by engaging in the wasteful stock buy-backs both to facilitate the vesting of millions of dollars in stock options and RSUs to Defendants Matta and Wesley and in order to facilitate the insider sales by the Insider Selling Defendants, Defendants have caused comScore to waste valuable corporate assets.

126.    As a result of Defendants' corporate waste, they are liable to the Company.

## COUNT VIII

### Unjust Enrichment Against Defendants Matta and Wesley and the Insider Selling Defendants

127.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

128.    As a result of the conduct described above, Defendants Matta and Wesley and the Insider Selling Defendants will be and have been unjustly enriched at the expense of comScore.

129.    The Insider Selling Defendants sold comScore stock for a profit during the period of deception, misusing confidential non-public corporate information.  These Defendants should be required to disgorge the gains which they have and/or will otherwise unjustly obtain at the expense of comScore.  A constructive trust for the benefit of the Company should be imposed thereon.

130.    Defendants Matta and Wesley also obtained severance benefits that were not earned or justified but were instead paid as part of a scheme to cover up Defendants' complicity in the scheme.  A constructive trust for the benefit of the Company should be imposed thereon.

131.     Defendants Matta and Wesley also obtained vesting on millions of dollars of stock options and RSUs as a result of their efforts to artificially inflate the market price of comScore common stock.  A constructive trust for the benefit of the Company should be imposed thereon.

132.     All the payments, stock option and RSU vesting and stock sales proceeds provided to these Defendants were at the expense of comScore.  The Company received no benefit from these payments and stock sales proceeds.  comScore was damaged by such payments, vesting and stock sales proceeds.

## COUNT IX

### Against the Insider Selling Defendants for Breaches of Fiduciary Duties for Insider Selling and Misappropriation of Information

133.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

134.     At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold comScore common stock on the basis of such information.

135.     The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold comScore common stock.

136.     At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.  The Insider Selling Defendants' sales of comScore common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

137.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.     Awarding money damages against all Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure Defendants do not participate therein or benefit thereby;

B.     Directing all Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all severance payments, vesting of stock options and RSUs, payments of salaries, bonuses, fees, stock awards, options and common stock sale proceeds and imposing a constructive trust thereon;

C.     Directing comScore to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote adoption of the following Corporate Governance policies:

(i)     a permanent ban on engaging in "barter" transactions;

(ii)     a proposal prohibiting the Company from repurchasing common stock on the open market or from senior executives pursuant to 10b5-1 trading plans within six months sales of comScore common stock by the Company's senior executives;

(iii)    a proposal requiring that the offices of the CEO of comScore and Chairman of the comScore Board of Directors be permanently held by separate individuals and that the Chairman of the comScore Board meets rigorous "independent" standards;

(iv)    a proposal to strengthen the comScore Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

(v)    appropriately test and then strengthen the internal audit and control function;

(vi)    rotate independent auditing firms every five years;

(vii)    control and limit insider stock selling and the terms and timing of stock option grants; and

(viii)    reform executive compensation, including banning the practice of rewarding executives for simply raising the market price of comScore common stock.

D.    Ordering the imposition of a constructive trust over Defendants' insider sales proceeds, improper severance payments and improperly vested stock options;

E.    Awarding punitive damages;

F.    Awarding costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees; and

G.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  December 21, 2016              ROBBINS GELLER RUDMAN
                                       & DOWD LLP
                                      SAMUEL H. RUDMAN
                                      MARY K. BLASY

*/s/ Samuel H. Rudman*

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
BENNY C. GOODMAN, III
ERIK W. LUEDEKE
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
bennyg@rgrdlaw.com
eluedeke@rgrdlaw.com

VANOVERBEKE MICHAUD
   & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

*Attorneys for Plaintiff*

**VERIFICATION**

I, SAMUEL H. RUDMAN, hereby declare as follows:

1.      I am a member of the law firm of Robbins Geller Rudman & Dowd, LLP, counsel for Plaintiff in the above-entitled action.  I have read the foregoing Complaint and know the contents thereof.  I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.      I make this Verification because Plaintiff is absent from the County of Suffolk where I maintain my office.

Executed this 21st day of December, 2016, at Melville, New York.

_____
                    SAMUEL H. RUDMAN